UNITED STATES DISTRICT COURT
IN AND FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No.:

Edward Dovner and Karen Herman,

    Plaintiffs,

v.

Charles Lindsay and Conduce Inc.,

    Defendants.

_____

## **COMPLAINT**

  Plaintiffs Edward Dovner and Karen Herman (together, "Investors"), by and through their undersigned counsel, sue Charles Lindsay ("Lindsay") and Conduce Inc. ("Conduce"), and allege:

### **Nature of Action.**

1. This action arises out of Defendants' misrepresentations and fraudulent omissions to induce Dovner to invest in a private offering of securities by Conduce,  an operational intelligence platform for supply chain data. In particular, Defendants failed to disclose that part of Investors' investment monies would be used to pay Lindsay illegal commissions in violation of federal and state securities laws and the parties' written agreements.

### **Parties, Jurisdiction and Venue.**

2. Dovner is an individual who resides in Palm Beach County, Florida.

3. Herman is an individual who resides in Palm Beach County, Florida.

4.      Conduce is a Delaware corporation with principal place of business in Santa Barbara, California. Conduce is subject to personal jurisdiction in Florida because this action arises from its tortious acts within Florida.

5.      Lindsay is an individual who resides in Palm Beach County, Florida. Lindsay is not a registered broker or dealer under the laws of the United States or Florida.

6.      Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331 over Investors' causes of action founded upon 15 U.S.C. §§ 78j(b), 78o, 78cc. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the pendant state claims.

7.      Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391 because Lindsay resides in the District and a substantial part of the events or omissions giving rise to Investors' claims occurred here.

**Factual Allegations**

8.      In 2015, Dovner was introduced to Lindsay.  Lindsay touted his prowess in identifying and making money in investments.

9.      First, Lindsay induced Dovner to invest about $38,000.00 in Vaccinogen, Inc. ("VGEN"), a penny stock. He told Dovner that VGEN was going to increase tenfold in a period of several months.

10.     Next, Lindsay approached Dovner about making an investment in Conduce.  He described Conduce as a great investment, said a lot of people are putting money into it, touted its patented technology and stated it was safe place to put money.

11.     On Lindsay's encouragement, Dovner and his wife, Herman, decided to invest $100,000.00 and $200,000.00 respectively from their IRAs into Conduce.

12.     In approximately 2016, Dovner and Herman executed Series Seed Preferred Stock Subscription Agreements ("Agreements") that are attached hereto as **Exhibit "A."**

13.     Neither Defendants nor the Agreements disclosed that Lindsay would earn any commission for obtaining Investors' investment monies for Conduce.

14.     In fact, the Agreements state: "Each of the parties represents and warrants to the other that no broker, finder or other financial consultant has acted on its behalf in connection with this Agreement or the transactions contemplated hereby…" Agreements at § 4(p).

15.     Unbeknownst to the Investors and contrary to the Agreements, Conduce paid Lindsay commissions on for procuring Investors' investments in Conduce.

16.     Later, Dovner's investment in VGEN went to zero.

17.     Dovner learned that his purchase in VGEN allowed another investor to sell out of his or her investment in VGEN, which Lindsay presumably knew was about to fail.

18.     Thereafter, Lindsay told Dovner that he was paid commissions on Investors' Conduce investments.

19.     Recently, Conduce communicated that it is going out of business and liquidating its assets.

20.     Investors demanded return of their investments in Conduce, but have not received any monies to date.

21.     Investors have retained the undersigned attorney to represent him in this action and has agreed to pay him a reasonable fee for his services.

22.     All conditions precedent have occurred, been waived or have been satisfied.

**Count I – Violation Of 15 U.S.C. §§ 78o; 78cc**
**(Investors v. All Defendants)**

23.      Investors reincorporate the allegations set forth in paragraphs 1 through 22 of the Complaint, as if fully set forth herein.

24.      Defendants sold Investors securities in Conduce.

25.      Lindsay is not registered or otherwise associated with a registered broker or dealer.

26.      Lindsay received illegal commissions in connection with the sale of securities.

27.      Defendants' sale of securities to Investors violated 15 U.S.C. § 78o.

28.      Investors elect to rescind the transaction pursuant to 15 U.S.C. § 78cc.

WHEREFORE, Investors demand a judgment of rescission Defendants, together with interest, attorneys' fees and costs and for such other relief this Court deems just and proper.

## Count II – Violation Of Fla. Stat. §§ 517.12; 517.211
### (Investors v. All Defendants)

29.      Investors reincorporate the allegations set forth in paragraphs 1 through 22 of the Complaint, as if fully set forth herein.

30.      Defendants sold Investors securities in Conduce.

31.      Lindsay is not registered or otherwise associated with a registered broker or dealer.

32.      Lindsay received illegal commissions in connection with the sale of securities.

33.      Defendants' sale of securities to Investors violated Fla. Stat. § 517.12.

34.      Investors elect to rescind the transaction pursuant to Fla. Stat. § 517.211.

WHEREFORE, Investors demand a judgment of rescission Defendants, together with interest, attorneys' fees and costs and for such other relief this Court deems just and proper.

**Count III – Violation Of 15 U.S.C. § 78j(b)**
**(Investors v. All Defendants)**

35.     Investors reincorporate the allegations set forth in paragraphs 1 through 22 of the

Complaint, as if fully set forth herein.

36.     17 C.F.R. § 240.10b-5, a regulation promulgated under 15 U.S.C. § 78j(b),

provides in pertinent part: It shall be unlawful for any person, directly or indirectly, by the use of

any means or instrumentality of interstate commerce, or of the mails or of any facility of any

national securities exchange,

> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state

> a material fact necessary in order to make the statements made, in the light

> of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which

> operates or would operate as a fraud or deceit upon any person, in

> connection with the purchase or sale of any security.

37.     To obtain the Investors' funds, the Defendants made untrue statements and

omissions regarding Conduce securities. The Defendants knew that their statements were false

and made them for the purpose of inducing the Investors' reliance thereon.

38.     The Defendants misrepresented the use of Investors' investment monies. These

misrepresentations were material.

39.     The Defendants failed to disclose to Investors that Lindsay would receive

commissions in connection with the investments. The omission was material.

40.     Investors relied upon Defendants' false statements and omissions, including that

monies would not be used for inappropriate purposes, in making their investment in Conduce.

But for Defendants' misrepresentations and omissions, Investors would not have invested in Conduce.

41.     Despite the Investors' demands for a return of their funds, Conduce has unlawfully retained the funds.

42.     Investors have suffered damages.

43.     Defendants engaged in a course of business, which operated as a fraud and deceit upon the investors.

44.     Defendants have violated 17 C.F.R. § 240.10b-5 and are liable for damages.

45.     Investors are entitled to recover from damages in an amount to be proven at trial, including but not limited to, the amount tendered to Conduce pursuant to the Agreements.

WHEREFORE, Investors demand judgment against Defendants, jointly and severally, for actual and compensatory damages, attorneys' fees and costs and for such other relief this Court deems just and proper.

### Count IV – Violation Of Section 517.301, Florida Statutes
### (Investors v. All Defendants)

46.     Investors reincorporate the allegations set forth in paragraphs 1 through 22 of the Complaint, as if fully set forth herein.

47.     Section 517.301(1)(a), Florida Statues provides in pertinent part:

(a) It is unlawful and a violation of the provisions of this chapter for a person:

(b) In connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of s. 517.051 and including any

security sold in a transaction exempted under the provisions of s. 517.061, directly or indirectly:

> 1. To employ any device, scheme, or artifice to defraud;

> 2. To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

> 3. To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

48.    To obtain the Investors' funds, the Defendants made untrue statements and omissions regarding Conduce securities. The Defendants knew that their statements were false and made them for the purpose of inducing the Investors' reliance thereon.

49.    The Defendants misrepresented the use of Investors' investment monies. These misrepresentations were material.

50.    The Defendants failed to disclose to Investors that Lindsay would receive commissions in connection with the investments. The omission was material.

51.    Investors relied upon Defendants' false statements and omissions, including that monies would not be used for inappropriate purposes, in making their investment in Conduce. But for Defendants' misrepresentations and omissions, Investors would not have invested in Conduce.

52.    Despite the Investors' demands for a return of their funds, Conduce has unlawfully retained the funds.

53.    Investors have suffered damages.

54.     Defendants engaged in a course of business, which operated as a fraud and deceit upon the investors.

55.     Defendants have violated Section 517.301, Florida Statutes, and are liable for damages.

56.     Investors are entitled to recover from Defendants damages in an amount to be proven at trial, including but not limited to, the amount tendered to Conduce pursuant to the Agreements.

WHEREFORE, Investors demand judgment against Defendants, jointly and severally, for actual and compensatory damages, attorneys' fees and costs and for such other relief this Court deems just and proper.

### Count V – Fraudulent Inducement
### (Investors v. All Defendants)

57.     Investors reincorporate the allegations set forth in paragraphs 1 through 22 of the Complaint, as if fully set forth herein.

58.     The Defendants misrepresented the use of Investors' investment monies. These misrepresentations were material

59.     The Defendants failed to disclose to Investors that Lindsay would receive commissions in connection with the investments. The omission was material.

60.     Defendants made the misrepresentations and omissions in order to induce Investors to acquire the securities that they offered and to enter into the Agreements.

61.     Defendants intended for Investors to rely upon their fraudulent misrepresentations and omissions.

62.     Investors reasonably relied upon the Defendants' fraudulent misrepresentations and omissions in providing investment funds to Conduce.

63.     Dovner suffered damages as a result of the fraud described herein.

WHEREFORE, Dovner demands judgment against Defendants, jointly and severally, for actual and compensatory damages, attorneys' fees and costs and for such other relief this Court deems just and proper.

## Count VI – Breach of Contract
### (Investors v. All Defendants)

64.     Investors reincorporate the allegations set forth in paragraphs 1 through 22 of the Complaint, as if fully set forth herein.

65.     The Agreements are enforceable contracts.

66.     The Defendants failed to disclose to Investors that Lindsay would receive commissions in connection with the investments. The omission was material.

67.     Conduce intended Lindsay to be a third party beneficiary of the Agreements in that they paid him commissions for obtaining the Investors' investment monies.

68.     Defendants breached Section 4(p) of the Agreements by Conduce paying Lindsay illegal commissions.

69.     As a result, Investors suffered damages.

WHEREFORE, Investors demand judgment against Defendants, jointly and severally, for rescission, or in the alternative, actual and compensatory damages, attorneys' fees and costs and for such other relief this Court deems just and proper.

DATED:        Boca Raton, FL
              December 4, 2019

                              _s/ Geoffrey M. Cahen_____
                              Geoffrey M. Cahen

Cahen Law P.A.
1900 Glades Road, Suite 270.
Boca Raton, FL 33431
Phone:  561-922-0430
E-Mail:  geoff@cahenlaw.com
            bocalegalasst@gmail.com



**CONDUCE INC.**
**SERIES SEED PREFERRED STOCK SUBSCRIPTION AGREEMENT**

Conduce Inc.
5464 Carpinteria Ave., Suite C
Carpinteria, CA 93013
Attention: Kevin Parent, President and CEO
Email: kevin@conduce.com

Ladies and Gentlemen:

This Series Seed Preferred Stock Subscription Agreement (this "**Agreement**") is made between Conduce Inc., a Delaware corporation (the "**Company**"), and the undersigned prospective purchaser (the "**Subscriber**"). The Subscriber is subscribing hereby for such number of shares of Series Seed Convertible Preferred Stock of the Company, par value $0.0001 per share, as are as are listed on the signature page hereto (the "**Shares**"). The Subscriber is subscribing hereby for the Shares at a purchase price per Share of $1.83852. This subscription is submitted to the Subscriber in accordance with, and subject to, the terms and conditions described in this Agreement.

In connection with the execution of this Agreement and to induce the Company to sell the Shares to the Subscriber, the Subscriber hereby represents, warrants and agrees as follows:

1.   Terms of Offering; Subscription; Investors' Rights Agreement.

(a)   The Subscriber has thoroughly read and understands this Agreement. Prior to the execution of this Agreement, the Subscriber and the Subscriber's advisors have had the opportunity to ask questions of, and receive answers from, representatives of the Company concerning the terms and conditions of this transaction, and the finances, operations, business and prospects of the Company. The Subscriber is satisfied that it has received information with respect to all matters that it considers material to its decision to make this investment and has based the decision to purchase the Shares solely on the information contained in the materials referred to in this Section 1.

(b)   The Subscriber hereby irrevocably subscribes for and agrees to purchase the Shares at a purchase price of $1.83852 per Share (the "**Subscription**") for the total purchase price set forth on the signature page hereto (the "**Purchase Price**"). The Subscriber shall provide payment in the full amount of the Purchase Price of the Shares for which the Subscriber is subscribing contemporaneous with returning this executed Agreement (the "**Payment**") via check to the Company at the address above or wire transfer to:

JPMorgan Chase Bank, N.A.
Domestic Wire ABA/Routing: ██████████
International Wire SWIFT Code: ██████████
Beneficiary: CONDUCE INC.
Account Number: ██████████

(c)   The Subscriber understands and agrees that the Company, in its sole discretion, reserves the right to accept or reject this or any other subscription for Shares, in whole or in part. If this Subscription is rejected in whole or in part for any reason, the Company will return the Subscriber's Payment promptly, without interest (in the case of the rejection of a portion of the Subscription, the part of the Payment relating to such rejected portion will be returned), and this Agreement shall continue in

1

full force and effect to the extent this Subscription was accepted. Those subscribers whose subscriptions are accepted (each, a "**Purchaser**") will be issued a stock certificate for the number of Shares purchased in the name of each such Purchaser, and the name of such Purchaser will be entered on the Company's stock transfer books as the record owner of such Shares.

(d)      The Subscriber agrees as a condition of the purchase and sale of the Shares to become a party to the Investors' Rights Agreement among the Company and its stockholders attached hereto as **Exhibit A** (the "**Investors' Rights Agreement**") by execution of the counterpart signature page enclosed therewith. The Subscriber acknowledges that they have read and understands the Investors' Rights Agreement.

2.      Accredited Investor.

(a)      The Subscriber is an "**Accredited Investor**" as such term is defined in Regulation D under the Securities Act of 1933, as amended (the "**Securities Act**") and as of the date of this Agreement falls within the following category or categories (**Please INITIAL one or more**):

_____      (1)      an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, a corporation, a business trust, limited liability company, or partnership, not formed for the specific purpose of acquiring the Shares, with total assets in excess of $5,000,000;

_____      (2)      a natural person whose individual net worth, or joint net worth with that person's spouse, at the time of such person's purchase of the Shares exceeds $1,000,000; 1

_____      (3)      a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

_____      (4)      a trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Shares, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D under the Securities Act; and/or

_____      (5)      an entity in which all of the equity owners are Accredited Investors.

(b)      In order to meet the conditions for exemption from the registration requirements under the securities laws of certain jurisdictions, purchasers who are residents of such jurisdictions may be required to meet additional suitability requirements.

3.      Representations and Warranties of the Subscriber.  In order to induce the Company to accept the Subscriber's subscription in whole or in part, the Subscriber hereby represents and warrants to the Company that:

(a)      Experience and Suitability.  The Subscriber is qualified by its knowledge and experience in financial and business matters to evaluate the merits and risks of an investment in the Shares and to

---

1  As used in herein, the term "net worth" means the excess of total assets over total liabilities.  In computing net worth, the net value of the principal residence of the purchaser must be excluded.  For purposes of determining the net value of the purchaser's primary residence, indebtedness secured by the purchaser's primary residence (i) within sixty (60) days of the date of the purchaser's execution of this Agreement, and/or (ii) in excess of the property's estimated fair market value must be treated as a liability in the net worth calculation.

make an informed decision relating thereto. The Subscriber has the financial capability for making the investment and protecting its interests, and the Subscriber can afford a complete loss of the investment. The investment is a suitable one for the Subscriber.

(b)     No Need for Liquidity. The Subscriber is aware that it will be unable to liquidate its investment readily in case of an emergency and that the Shares being purchased may have to be held for an indefinite period of time. The Subscriber's overall commitment to investments that are not readily marketable is not excessive in view of the Subscriber's net worth and financial circumstances and the purchase of the Shares will not cause such commitment to become excessive. In view of such facts, the Subscriber acknowledges that it has adequate means of providing for its current needs, anticipated future needs and possible contingencies and emergencies and has no need for liquidity in the investment in the Shares. The Subscriber is able to bear the economic risk of this investment.

(c)     Opportunity to Investigate. Prior to the execution of this Agreement, the Subscriber and its advisors have had the opportunity to ask questions of, and receive answers from, representatives of the Company concerning the terms and conditions of this transaction, and the finances, operations, business and prospects of the Company. The Subscriber and its advisors also had the opportunity to obtain additional information necessary to verify the accuracy of information furnished about the Company. Accordingly, the Subscriber has independently evaluated the risks of purchasing the Shares, and the Subscriber is satisfied that it has received information with respect to all matters that it considers material to its decision to make this investment.

(d)     Risk Factors. The Subscriber understands that the risks described in this Agreement are not a complete list of risks involved in an investment in the Company. The Subscriber fully understands that the Company has limited financial and operating history and that the Shares are speculative investments that involve a high degree of risk of loss of the Subscriber's entire investment. The Subscriber is familiar with the general risks of investment in companies with a limited operating history. The Subscriber understands that the Company is subject to all of such risks, and to all of the risks inherent in any such effort. The Subscriber is aware that no public market exists for the Shares and that the Shares may not be sold without compliance with applicable federal and state securities laws. The Subscriber understands that the Company has made no assurances that a public market will ever exist for the Shares and that, even if a public market exists in the future, the Subscriber may not readily be able to sell the Shares. The Subscriber has considered each of these risks regarding an investment in the Company and the Shares. In addition to such risks, the Subscriber considered the following risks regarding an investment in the Company:

(i)     The Shares involve a highly speculative investment that should only be considered by persons who can afford the loss of their entire investment in the Company.

(ii)     The Company is an early stage company. Accordingly, it is subject to all of the risks inherent in the establishment of a new business enterprise.

(iii)     The Company expects to incur losses as it develops its business and customer base. The extent of future losses and the time required to achieve profitability is highly uncertain. There can be no assurance that the Company will ever achieve a profitable level of operations or that profitability, if achieved, can be sustained on an ongoing basis.

(iv)     The Company will require substantial additional funds before it can expect to realize significant revenues from its business. The Company cannot be certain that additional financing will be available in the future to the extent required or that, if

3

available, it will be on acceptable terms. Additional financing will dilute the Subscriber's investment.

(v)     The Company may face competition from other sources. Some of these competitors have substantially greater capital resources and experience than the Company.

(vi)     The Company's management has limited experience. The Company's current and planned personnel, systems, procedures and controls may be inadequate to support its planned growth, and its management may not be able to identify, manage and exploit existing and potential market opportunities successfully.

(e)     <u>Investment Purpose</u>. The Subscriber is acquiring the Shares for its own account for the purpose of investment and not with a view to, or for resale in connection with, the distribution thereof, nor with any present intention of distributing or selling the Shares. The Subscriber understands that the Shares have not been registered under the Securities Act or the securities laws of any state, and the Subscriber hereby agrees not to make any sale, transfer or other disposition of any such Shares unless either (i) the Shares first shall have been registered under the Securities Act and all applicable state securities laws, or (ii) an exemption from such registration is available, and the Company has received such documents and agreements from the Subscriber and the transferee as the Company requests at such time. The Subscriber further understands that no federal or state agency has approved, disapproved or made any findings or determinations as to the fairness for investment, nor any recommendation of endorsement of the merits of the offering of the Shares.

(f)     <u>Legends</u>. The Subscriber understands that until the Shares have been registered under the Securities Act and applicable state securities laws each certificate, if any, representing such Shares shall bear a legend substantially similar to the following, in addition to any legends required by the Investors' Rights Agreement:

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. HOLDERS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN THE FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

(g)     <u>No Regulatory Approval of Merits</u>. The Subscriber understands that neither the Securities and Exchange Commission nor the commissioner or department of securities or attorney general of any state has passed upon the merits or qualifications of, nor recommended nor approved, the Shares. Any representation to the contrary is a criminal offense.

(h)     <u>Independent Advice</u>. The Subscriber understands that the Subscriber is urged to seek

4

independent advice from its professional advisors relating to the suitability for the Subscriber of an investment in the Company in view of its overall financial needs and with respect to the legal and tax implications of such an investment. The Subscriber acknowledges that the law firm of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. represents the Company, and not the Subscriber.

(i)     Indemnification.  The Subscriber understands the meaning and legal consequences of this Agreement and agrees to indemnify and hold harmless the Company and each director and officer thereof from and against any and all loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Subscriber contained in this Agreement.

(j)     Authority and Noncontravention.  The execution and performance hereof violates no order, judgment, injunction, agreement or controlling document to which the Subscriber is a party or by which the Subscriber is bound.  If an entity, (i) the Subscriber is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it has been formed; (ii) the Subscriber has the right and power under its organizational instruments to execute, deliver and perform its obligations hereunder; and (iii) this Agreement has been duly authorized by all necessary action on the part of all officers, directors, partners, stockholders and trustees and will not violate any agreement to which the Subscriber is a party; and (iv) the individual executing and delivering this Agreement has the requisite right, power, capacity and authority to do so on behalf of the organization.  The Subscriber has not been organized for the purpose of subscribing for the Shares.

(k)     Duration.  The Subscriber understands that it may not cancel, terminate or revoke this Agreement or any agreement made by it hereunder, and, if the Subscriber is an individual, that this Agreement shall survive the Subscriber's death or disability and shall be binding upon the Subscriber's heirs, executors, administrators, successors and assigns.

(l)     Further Assurances.  Within ten (10) days after receipt of a written request from the Company, the Subscriber agrees to provide such information and to execute and deliver such documents as reasonably may be necessary to comply with any and all laws and ordinances to which the Company is subject.

(m)     Residence.  The Subscriber is resident in the state set forth below and is receiving the Shares in that state.

(n)     Office of Foreign Assets Control.

(1)     The Subscriber should check the Office of Foreign Assets Control ("OFAC") website at http://www.treas.gov/ofac before making the following representations.  The Subscriber represents that the amounts to be invested by it in the Shares were not and are not directly or indirectly derived from activities that contravene federal, state or international laws and regulations, including anti-money laundering laws and regulations.  Federal regulations and Executive Orders administered by OFAC prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals.  The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at http://www.treas.gov/ofac.  In addition, the programs administered by OFAC (the "**OFAC Programs**") prohibit dealing with individuals2 or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.

---

2 These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

(2)     To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or controlled by the Subscriber; (3) if the Subscriber is a privately held entity, any person having a beneficial interest in the Subscriber; or (4) any person for whom the Subscriber is acting as agent or nominee in connection with this investment is a country, territory, individual or entity named on an OFAC list, or a person or entity prohibited under the OFAC Programs. Please be advised that the Company may not accept any amounts for the Shares if the Subscriber cannot make the representation set forth in the preceding sentence.  The Subscriber agrees to promptly notify the Company should the Subscriber become aware of any change in the information set forth in these representations.  The Subscriber understands and acknowledges that, by law, the Company may be obligated to "freeze the account" of the Subscriber, either by prohibiting additional subscriptions from the Subscriber or declining any redemption requests, and the Company may also be required to report such action and to disclose the Subscriber's identity to OFAC. The Subscriber further acknowledges that the Company may, by written notice to the Subscriber, suspend the redemption rights, if any, of the Subscriber if the Company reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Company or any of the Company's other service providers.  These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

(3)     To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or controlled by the Subscriber; or (3) if the Subscriber is a privately-held entity, any person having a beneficial interest in the Subscriber is a senior foreign political figure3, or any immediate family4 member or close associate5 of a senior foreign political figure, as such terms are defined in the footnotes below.

(4)     If the Subscriber is affiliated with a non-U.S. banking institution (a "**Foreign Bank**"), or if the Subscriber receives deposits from, makes payments on behalf of, or handles other financial transactions related to a Foreign Bank, the Subscriber represents and warrants to the Company that: (1) the Foreign Bank has a fixed address, other than solely an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities; (2) the Foreign Bank maintains operating records related to its banking activities; (3) the Foreign Bank is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities; and (4) the Foreign Bank does not provide banking services to any other Foreign Bank that does not have a physical presence in any country and that is not a regulated affiliate.

The Subscriber hereby acknowledges that the representations and warranties contained in this Agreement are made by the Subscriber with the intent that such representations and warranties may be relied upon by the Company and its agents in determining the Subscriber's eligibility to purchase the Shares.    By this Agreement, the Subscriber represents and warrants that the foregoing representations and warranties are true at the time of closing with the same force and effect as if they had been made by the Subscriber at the closing time, and that they shall survive the purchase by it of the Shares and shall

---

3 A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

4 "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.

5 A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

continue in full force and effect notwithstanding any subsequent disposition by it of the Shares.

      4.    <u>Miscellaneous</u>.

      (a)    <u>Accuracy of Information</u>.  The information contained herein is complete and accurate and may be relied upon by the Company, and the Subscriber will notify the Company immediately of any material change in any of such information occurring prior to the closing, if any, with respect to the purchase of Shares by the Subscriber or any co-purchaser.

      (b)    <u>Notices</u>.  All notices, requests, consents and other communications hereunder shall be in writing, shall be addressed to the receiving party's address set forth below or to such other address as a party may designate by notice hereunder, and shall be either (i) delivered by hand, (ii) made by facsimile or email transmission, (iii) sent by overnight courier, or (iv) sent by certified mail, return receipt requested, postage prepaid.

          If to the Subscriber:

              To the address designated in Section 4(r) hereof.

          If to the Company:

              To the address set forth at the beginning of this Agreement.

All notices, requests, consents and other communications hereunder shall be deemed to have been given either (A) if by hand, at the time of the delivery thereof to the receiving party at the address of such party set forth above, (B) if made by facsimile or email transmission, at the time that receipt thereof has been acknowledged by the intended recipient by electronic confirmation or otherwise, (C) if sent by overnight courier, on the second business day following the day such notice is delivered to the courier service, or (iv) if sent by certified mail, upon receipt.

      (c)    <u>Entire Agreement</u>.  This Agreement, together with the Investors' Rights Agreement, embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written agreements and understandings relating to the subject matter hereof.  No statement, representation, warranty, covenant or agreement of any kind not expressly set forth in this Agreement shall affect, or be used to interpret, change or restrict, the express terms and provisions of this Agreement.

      (d)    <u>Modifications and Amendments</u>.  The terms and provisions of this Agreement may be modified or amended only by written agreement executed by the parties hereto.

      (e)    <u>Waivers and Consents</u>.  The terms and provisions of this Agreement may be waived, or consent for the departure therefrom granted, only by written document executed by the party entitled to the benefits of such terms or provisions.  No such waiver or consent shall be deemed to be or shall constitute a waiver or consent with respect to any other terms or provisions of this Agreement, whether or not similar. Each such waiver or consent shall be effective only in the specific instance and for the purpose for which it was given, and shall not constitute a continuing waiver or consent.

      (f)    <u>Assignment</u>.  This Agreement may not be transferred or assigned without the prior written consent of the Company and any such transfer or assignment shall be made only in accordance with applicable laws and any such consent.

(g)     Benefit.  All statements, representations, warranties, covenants and agreements in this Agreement shall be binding on the parties hereto and shall inure to the benefit of the respective successors and permitted assigns of each party hereto.  Nothing in this Agreement shall be construed to create any rights or obligations except among the parties hereto, and no person or entity shall be regarded as a thirdparty beneficiary of this Agreement.

(h)     Governing Law.  This Agreement and the rights and obligations of the parties hereunder shall be construed in accordance with and governed by the law of the State of Delaware, without giving effect to the conflict of law principles thereof.

(i)     Jurisdiction and Service of Process.  Any legal action or proceeding with respect to this Agreement shall be brought in the courts of the State of New York or of the United States of America for the Southern District of New York.  By execution and delivery of this Agreement, each of the parties hereto accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.  Each of the parties hereto irrevocably consents to the service of process of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by certified mail, postage prepaid, to the party at its address set forth in Section 4(b) hereof.

(j)     Severability.  In the event that any court of competent jurisdiction shall determine that any provision, or any portion thereof, contained in this Agreement shall be unenforceable in any respect, then such provision shall be deemed limited to the extent that such court deems it enforceable, and as so limited shall remain in full force and effect.  In the event that such court shall deem any such provision, or portion thereof, wholly unenforceable, the remaining provisions of this Agreement shall nevertheless remain in full force and effect.

(k)     Interpretation.  The parties hereto acknowledge and agree that: (i) each party has had the opportunity to have counsel review the terms and provisions of this Agreement; (ii) the rule of construction to the effect that any ambiguities are resolved against the drafting party shall not be employed in the interpretation of this Agreement; and (iii) the terms and provisions of this Agreement shall be construed fairly as to the parties hereto and not in favor of or against any party, regardless of which party was generally responsible for the preparation of this Agreement.  Whenever used herein, the singular number shall include the plural, the plural shall include the singular, the use of any gender shall include all persons.

(l)     Headings and Captions.  The headings and captions of the various subdivisions of this Agreement are for convenience of reference only and shall in no way modify, or affect the meaning or construction of any of the terms or provisions hereof.

(m)     No Waiver of Rights, Powers and Remedies.  No failure or delay by a party hereto in exercising any right, power or remedy under this Agreement, and no course of dealing between the parties hereto, shall operate as a waiver of any such right, power or remedy of the party.  No single or partial exercise of any right, power or remedy under this Agreement by a party hereto, nor any abandonment or discontinuance of steps to enforce any such right, power or remedy, shall preclude such party from any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.  The election of any remedy by a party hereto shall not constitute a waiver of the right of such party to pursue other available remedies.  No notice to or demand on a party not expressly required under this Agreement shall entitle the party receiving such notice or demand to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the party giving such notice or demand to any other or further action in any circumstances without such notice or demand.

(n)     Survival of Representations and Warranties.  All representations and warranties made by

8

the parties hereto in this Agreement shall survive the execution and delivery hereof.

(o)     Expenses.  Each of the parties hereto shall pay its own fees and expenses (including the fees of any attorneys, accountants, appraisers or others engaged by such party) in connection with this Agreement and the transactions contemplated hereby whether or not the transactions contemplated hereby are consummated.

(p)     No Broker or Finder.  Each of the parties hereto represents and warrants to the other that no broker, finder or other financial consultant has acted on its behalf in connection with this Agreement or the transactions contemplated hereby in such a way as to create any liability on the part of the other.  Each of the parties hereto agrees to indemnify and save the other harmless from any claim or demand for commission or other compensation by any broker, finder, financial consultant or similar agent claiming to have been employed by or on behalf of such party and to bear the cost of legal expenses incurred in defending against any such claim.

(q)     Counterparts.  This Agreement may be executed in one or more counterparts, including electronic counterparts delivered by email as a .PDF document or by facsimile, and by different parties hereto on separate counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(r)     The Subscriber is purchasing the Shares as follows (please check as appropriate):

_____ individually          ___X___     in trust

_____ joint tenants          _____ as a partnership or LLC

_____ tenants in common     _____ other: _____

Name of Subscriber: _Equity Trust Company as custodian for Edward Dovner IRA
Address for Notice: _1 Equity Way, Westlake, OH 44145 Attn: Michael Cozart
Telephone: _855-621-9857
Email Address: _m.cozart@trustetc.com

Federal Income Tax I.D. (for entities): _____
Social Security Number (for individuals): _███████████████████

5.      Under penalties of perjury, the Subscriber certifies that:

(a)     The number shown above is the Subscriber's correct Taxpayer Identification Number or Social Security Number, as the case may be;

(b)     The Subscriber is not subject to backup withholding either because the Subscriber has not been notified by the Internal Revenue Service ("IRS") that the Subscriber is subject to backup withholding as a result of a failure to report all interest or dividends, or the IRS has notified the Subscriber that the Subscriber is no longer subject to backup withholding;

(c)     The Subscriber is an Accredited Investor; and

(d)     THE SUBSCRIBER IS SUBSCRIBING FOR THE SHARES ONLY AFTER HAVING READ, CONSIDERED AND FULLY UNDERSTOOD THIS AGREEMENT, INCLUDING ALL OF

THE RISKS DESCRIBED HEREIN.  THE SUBSCRIBER IS NOT RELYING ON ANY INFORMATION OR REPRESENTATION CONCERNING THE COMPANY OR THE SHARES EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT.

[Remainder of page intentionally left blank. Signature page follows.]

10

IN WITNESS WHEREOF, the Subscriber has executed this Agreement as a sealed instrument on this 3rd day of December, 2015.

Number of Shares that the Subscriber is entitled to purchase pursuant to this Agreement: 54,391 shares of Series Seed Preferred Stock for a total Purchase Price of $100,000.

**For Individual Investors:**                    **For Coowners (if applicable):**

_____              _____
Investor Signature                                   Investor Signature

_____              _____
Print Name                                              Print Name

**For Entities:**

Equity Trust Company as Custodian for Edward Dovner IRA _____
Name of Entity

_____
By (authorized signature)

Edward Dovner _____
Print Name

Beneficiary _____
Title

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The foregoing subscription for Shares of Series Seed Preferred Stock of Conduce Inc. is hereby accepted.

**CONDUCE Inc.**

By:        _____
Name:   _____
Its:       _____
Date:    _____

[Signature Page – Subscription Agreement]

IN WITNESS WHEREOF, the Subscriber has executed this Agreement as a sealed instrument on this 3rd day of December, 2015.

Number of Shares that the Subscriber is entitled to purchase pursuant to this Agreement: 54,391 shares of Series Seed Preferred Stock for a total Purchase Price of $100,000.

For Individual Investors:                        For Coowners (if applicable):

_____                   _____
Investor Signature                                  Investor Signature

_____                   _____
Print Name                                              Print Name

For Entities:

Equity Trust Company as Custodian for Edward Dovner IRA
Name of Entity
_____
By (authorized signature)

Edward Dovner
Print Name

Beneficiary
Title

☼☼☼☼☼☼☼☼☼☼☼☼☼☼☼☼☼☼☼☼☼☼☼☼☼☼☼

   The foregoing subscription for Shares of Series Seed Preferred Stock of Conduce Inc. is hereby accepted.

CONDUCE Inc.

By:      _____
Name:   Kevin Parent
Its:       Chief Executive Officer
Date:    December 21, 2015

[Signature Page – Subscription Agreement]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

INVESTORS:

By: _Equity Trust Co Custodian_
_For Edward Dowmie IRA_

Name: _Edward R Dow_

Title: _Beneficiary_

**CONDUCE INC.**
**SERIES SEED PREFERRED STOCK SUBSCRIPTION AGREEMENT**

Conduce Inc.
5464 Carpinteria Ave., Suite C
Carpinteria, CA  93013
Attention: Kevin Parent, President and CEO
Email: kevin@conduce.com

Ladies and Gentlemen:

This Series Seed Preferred Stock Subscription Agreement (this "**Agreement**") is made between Conduce Inc., a Delaware corporation (the "**Company**"), and the undersigned prospective purchaser (the "**Subscriber**"). The Subscriber is subscribing hereby for such number of shares of Series Seed Convertible Preferred Stock of the Company, par value $0.0001 per share, as are as are listed on the signature page hereto (the "**Shares**"). The Subscriber is subscribing hereby for the Shares at a purchase price per Share of $1.83852. This subscription is submitted to the Subscriber in accordance with, and subject to, the terms and conditions described in this Agreement.

In connection with the execution of this Agreement and to induce the Company to sell the Shares to the Subscriber, the Subscriber hereby represents, warrants and agrees as follows:

1.    <u>Terms of Offering; Subscription; Investors' Rights Agreement</u>.

(a)    The Subscriber has thoroughly read and understands this Agreement.  Prior to the execution of this Agreement, the Subscriber and the Subscriber's advisors have had the opportunity to ask questions of, and receive answers from, representatives of the Company concerning the terms and conditions of this transaction, and the finances, operations, business and prospects of the Company. The Subscriber is satisfied that it has received information with respect to all matters that it considers material to its decision to make this investment and has based the decision to purchase the Shares solely on the information contained in the materials referred to in this Section 1.

(b)    The Subscriber hereby irrevocably subscribes for and agrees to purchase the Shares at a purchase price of $1.83852 per Share (the "**Subscription**") for the total purchase price set forth on the signature page hereto (the "**Purchase Price**").  The Subscriber shall provide payment in the full amount of the Purchase Price of the Shares for which the Subscriber is subscribing contemporaneous with returning this executed Agreement (the "**Payment**") via check to the Company at the address above or wire transfer to:

> JPMorgan Chase Bank, N.A.
> Domestic Wire ABA/Routing: ▓▓▓▓▓▓▓▓
> International Wire SWIFT Code: ▓▓▓▓▓▓▓▓
> Beneficiary:  CONDUCE INC.
> Account Number: ▓▓▓▓▓▓▓

(c)    The Subscriber understands and agrees that the Company, in its sole discretion, reserves the right to accept or reject this or any other subscription for Shares, in whole or in part.  If this Subscription is rejected in whole or in part for any reason, the Company will return the Subscriber's Payment promptly, without interest (in the case of the rejection of a portion of the Subscription, the part of the Payment relating to such rejected portion will be returned), and this Agreement shall continue in

1

full force and effect to the extent this Subscription was accepted. Those subscribers whose subscriptions are accepted (each, a "Purchaser") will be issued a stock certificate for the number of Shares purchased in the name of each such Purchaser, and the name of such Purchaser will be entered on the Company's stock transfer books as the record owner of such Shares.

(d)     The Subscriber agrees as a condition of the purchase and sale of the Shares to become a party to the Investors' Rights Agreement among the Company and its stockholders attached hereto as <u>Exhibit A</u> (the "Investors' Rights Agreement") by execution of the counterpart signature page enclosed therewith. The Subscriber acknowledges that they have read and understands the Investors' Rights Agreement.

2.     <u>Accredited Investor</u>.

(a)     The Subscriber is an "Accredited Investor" as such term is defined in Regulation D under the Securities Act of 1933, as amended (the "Securities Act") and as of the date of this Agreement falls within the following category or categories (Please <u>INITIAL</u> one or more):

_____     (1)     an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, a corporation, a business trust, limited liability company, or partnership, not formed for the specific purpose of acquiring the Shares, with total assets in excess of $5,000,000;

_____     (2)     a natural person whose individual net worth, or joint net worth with that person's spouse, at the time of such person's purchase of the Shares exceeds $1,000,000; 1

_____     (3)     a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

_____     (4)     a trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Shares, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D under the Securities Act; and/or

_____     (5)     an entity in which all of the equity owners are Accredited Investors.

(b)     In order to meet the conditions for exemption from the registration requirements under the securities laws of certain jurisdictions, purchasers who are residents of such jurisdictions may be required to meet additional suitability requirements.

3.     <u>Representations and Warranties of the Subscriber</u>.   In order to induce the Company to accept the Subscriber's subscription in whole or in part, the Subscriber hereby represents and warrants to the Company that:

(a)     <u>Experience and Suitability</u>.   The Subscriber is qualified by its knowledge and experience in financial and business matters to evaluate the merits and risks of an investment in the Shares and to

---

1   As used in herein, the term "net worth" means the excess of total assets over total liabilities. In computing net worth, the net value of the principal residence of the purchaser must be excluded. For purposes of determining the net value of the purchaser's primary residence, indebtedness secured by the purchaser's primary residence (i) within sixty (60) days of the date of the purchaser's execution of this Agreement, and/or (ii) in excess of the property's estimated fair market value must be treated as a liability in the net worth calculation.

in financial and business matters to evaluate the merits and risks of an investment in the Shares and to make an informed decision relating thereto. The Subscriber has the financial capability for making the investment and protecting its interests, and the Subscriber can afford a complete loss of the investment. The investment is a suitable one for the Subscriber.

(b)      No Need for Liquidity.  The Subscriber is aware that it will be unable to liquidate its investment readily in case of an emergency and that the Shares being purchased may have to be held for an indefinite period of time.  The Subscriber's overall commitment to investments that are not readily marketable is not excessive in view of the Subscriber's net worth and financial circumstances and the purchase of the Shares will not cause such commitment to become excessive.  In view of such facts, the Subscriber acknowledges that it has adequate means of providing for its current needs, anticipated future needs and possible contingencies and emergencies and has no need for liquidity in the investment in the Shares. The Subscriber is able to bear the economic risk of this investment.

(c)      Opportunity to Investigate.  Prior to the execution of this Agreement, the Subscriber and its advisors have had the opportunity to ask questions of, and receive answers from, representatives of the Company concerning the terms and conditions of this transaction, and the finances, operations, business and prospects of the Company.  The Subscriber and its advisors also had the opportunity to obtain additional information necessary to verify the accuracy of information furnished about the Company. Accordingly, the Subscriber has independently evaluated the risks of purchasing the Shares, and the Subscriber is satisfied that it has received information with respect to all matters that it considers material to its decision to make this investment.

(d)      Risk Factors. The Subscriber understands that the risks described in this Agreement are not a complete list of risks involved in an investment in the Company. The Subscriber fully understands that the Company has limited financial and operating history and that the Shares are speculative investments that involve a high degree of risk of loss of the Subscriber's entire investment. The Subscriber is familiar with the general risks of investment in companies with a limited operating history. The Subscriber understands that the Company is subject to all of such risks, and to all of the risks inherent in any such effort. The Subscriber is aware that no public market exists for the Shares and that the Shares may not be sold without compliance with applicable federal and state securities laws.  The Subscriber understands that the Company has made no assurances that a public market will ever exist for the Shares and that, even if a public market exists in the future, the Subscriber may not readily be able to sell the Shares.  The Subscriber has considered each of these risks regarding an investment in the Company and the Shares.  In addition to such risks, the Subscriber considered the following risks regarding an investment in the Company:

(i)      The Shares involve a highly speculative investment that should only be considered by persons who can afford the loss of their entire investment in the Company.

(ii)      The Company is an early stage company.  Accordingly, it is subject to all of the risks inherent in the establishment of a new business enterprise.

(iii)      The Company expects to incur losses as it develops its business and customer base.  The extent of future losses and the time required to achieve profitability is highly uncertain. There can be no assurance that the Company will ever achieve a profitable level of operations or that profitability, if achieved, can be sustained on an ongoing basis.

(iv)      The Company will require substantial additional funds before it can expect to realize significant revenues from its business.  The Company cannot be certain that

3

additional financing will be available in the future to the extent required or that, if available, it will be on acceptable terms. Additional financing will dilute the Subscriber's investment.

(v)     The Company may face competition from other sources. Some of these competitors have substantially greater capital resources and experience than the Company.

(vi)     The Company's management has limited experience. The Company's current and planned personnel, systems, procedures and controls may be inadequate to support its planned growth, and its management may not be able to identify, manage and exploit existing and potential market opportunities successfully.

(e)     <u>Investment Purpose</u>. The Subscriber is acquiring the Shares for its own account for the purpose of investment and not with a view to, or for resale in connection with, the distribution thereof, nor with any present intention of distributing or selling the Shares. The Subscriber understands that the Shares have not been registered under the Securities Act or the securities laws of any state, and the Subscriber hereby agrees not to make any sale, transfer or other disposition of any such Shares unless either (i) the Shares first shall have been registered under the Securities Act and all applicable state securities laws, or (ii) an exemption from such registration is available, and the Company has received such documents and agreements from the Subscriber and the transferee as the Company requests at such time. The Subscriber further understands that no federal or state agency has approved, disapproved or made any findings or determinations as to the fairness for investment, nor any recommendation of endorsement of the merits of the offering of the Shares.

(f)     <u>Legends</u>. The Subscriber understands that until the Shares have been registered under the Securities Act and applicable state securities laws each certificate, if any, representing such Shares shall bear a legend substantially similar to the following, in addition to any legends required by the Investors' Rights Agreement:

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. HOLDERS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN THE FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

(g)     <u>No Regulatory Approval of Merits</u>.  The Subscriber understands that neither the Securities and Exchange Commission nor the commissioner or department of securities or attorney general of any state has passed upon the merits or qualifications of, nor recommended nor approved, the Shares. Any representation to the contrary is a criminal offense.

(h)     Independent Advice. The Subscriber understands that the Subscriber is urged to seek independent advice from its professional advisors relating to the suitability for the Subscriber of an investment in the Company in view of its overall financial needs and with respect to the legal and tax implications of such an investment. The Subscriber acknowledges that the law firm of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. represents the Company, and not the Subscriber.

(i)     Indemnification. The Subscriber understands the meaning and legal consequences of this Agreement and agrees to indemnify and hold harmless the Company and each director and officer thereof from and against any and all loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Subscriber contained in this Agreement.

(j)     Authority and Noncontravention. The execution and performance hereof violates no order, judgment, injunction, agreement or controlling document to which the Subscriber is a party or by which the Subscriber is bound. If an entity, (i) the Subscriber is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it has been formed; (ii) the Subscriber has the right and power under its organizational instruments to execute, deliver and perform its obligations hereunder; and (iii) this Agreement has been duly authorized by all necessary action on the part of all officers, directors, partners, stockholders and trustees and will not violate any agreement to which the Subscriber is a party; and (iv) the individual executing and delivering this Agreement has the requisite right, power, capacity and authority to do so on behalf of the organization. The Subscriber has not been organized for the purpose of subscribing for the Shares.

(k)     Duration. The Subscriber understands that it may not cancel, terminate or revoke this Agreement or any agreement made by it hereunder, and, if the Subscriber is an individual, that this Agreement shall survive the Subscriber's death or disability and shall be binding upon the Subscriber's heirs, executors, administrators, successors and assigns.

(l)     Further Assurances. Within ten (10) days after receipt of a written request from the Company, the Subscriber agrees to provide such information and to execute and deliver such documents as reasonably may be necessary to comply with any and all laws and ordinances to which the Company is subject.

(m)     Residence. The Subscriber is resident in the state set forth below and is receiving the Shares in that state.

(n)     Office of Foreign Assets Control.

(1)     The Subscriber should check the Office of Foreign Assets Control ("**OFAC**") website at http://www.treas.gov/ofac before making the following representations. The Subscriber represents that the amounts to be invested by it in the Shares were not and are not directly or indirectly derived from activities that contravene federal, state or international laws and regulations, including anti-money laundering laws and regulations. Federal regulations and Executive Orders administered by OFAC prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at http://www.treas.gov/ofac. In addition, the programs administered by OFAC (the "**OFAC Programs**") prohibit dealing with individuals[2] or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.

---

[2] These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

(2)    To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or controlled by the Subscriber; (3) if the Subscriber is a privately held entity, any person having a beneficial interest in the Subscriber; or (4) any person for whom the Subscriber is acting as agent or nominee in connection with this investment is a country, territory, individual or entity named on an OFAC list, or a person or entity prohibited under the OFAC Programs. Please be advised that the Company may not accept any amounts for the Shares if the Subscriber cannot make the representation set forth in the preceding sentence. The Subscriber agrees to promptly notify the Company should the Subscriber become aware of any change in the information set forth in these representations. The Subscriber understands and acknowledges that, by law, the Company may be obligated to "freeze the account" of the Subscriber, either by prohibiting additional subscriptions from the Subscriber or declining any redemption requests, and the Company may also be required to report such action and to disclose the Subscriber's identity to OFAC. The Subscriber further acknowledges that the Company may, by written notice to the Subscriber, suspend the redemption rights, if any, of the Subscriber if the Company reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Company or any of the Company's other service providers. These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

(3)    To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or controlled by the Subscriber; or (3) if the Subscriber is a privately-held entity, any person having a beneficial interest in the Subscriber is a senior foreign political figure[3], or any immediate family[4] member or close associate[5] of a senior foreign political figure, as such terms are defined in the footnotes below.

(4)    If the Subscriber is affiliated with a non-U.S. banking institution (a "**Foreign Bank**"), or if the Subscriber receives deposits from, makes payments on behalf of, or handles other financial transactions related to a Foreign Bank, the Subscriber represents and warrants to the Company that: (1) the Foreign Bank has a fixed address, other than solely an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities; (2) the Foreign Bank maintains operating records related to its banking activities; (3) the Foreign Bank is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities; and (4) the Foreign Bank does not provide banking services to any other Foreign Bank that does not have a physical presence in any country and that is not a regulated affiliate.

The Subscriber hereby acknowledges that the representations and warranties contained in this Agreement are made by the Subscriber with the intent that such representations and warranties may be relied upon by the Company and its agents in determining the Subscriber's eligibility to purchase the Shares.    By this Agreement, the Subscriber represents and warrants that the foregoing representations and warranties are true at the time of closing with the same force and effect as if they had been made by the Subscriber at the closing time, and that they shall survive the purchase by it of the Shares and shall

---

[3] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.
[4] "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.
[5] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

6

continue in full force and effect notwithstanding any subsequent disposition by it of the Shares.

        4.    <u>Miscellaneous</u>.

        (a)    <u>Accuracy of Information</u>. The information contained herein is complete and accurate and may be relied upon by the Company, and the Subscriber will notify the Company immediately of any material change in any of such information occurring prior to the closing, if any, with respect to the purchase of Shares by the Subscriber or any co-purchaser.

        (b)    <u>Notices</u>. All notices, requests, consents and other communications hereunder shall be in writing, shall be addressed to the receiving party's address set forth below or to such other address as a party may designate by notice hereunder, and shall be either (i) delivered by hand, (ii) made by facsimile or email transmission, (iii) sent by overnight courier, or (iv) sent by certified mail, return receipt requested, postage prepaid.

        If to the Subscriber:

                To the address designated in Section 4(r) hereof.

        If to the Company:

                To the address set forth at the beginning of this Agreement.

All notices, requests, consents and other communications hereunder shall be deemed to have been given either (A) if by hand, at the time of the delivery thereof to the receiving party at the address of such party set forth above, (B) if made by facsimile or email transmission, at the time that receipt thereof has been acknowledged by the intended recipient by electronic confirmation or otherwise, (C) if sent by overnight courier, on the second business day following the day such notice is delivered to the courier service, or (iv) if sent by certified mail, upon receipt.

        (c)    <u>Entire Agreement</u>. This Agreement, together with the Investors' Rights Agreement, embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written agreements and understandings relating to the subject matter hereof. No statement, representation, warranty, covenant or agreement of any kind not expressly set forth in this Agreement shall affect, or be used to interpret, change or restrict, the express terms and provisions of this Agreement.

        (d)    <u>Modifications and Amendments</u>. The terms and provisions of this Agreement may be modified or amended only by written agreement executed by the parties hereto.

        (e)    <u>Waivers and Consents</u>. The terms and provisions of this Agreement may be waived, or consent for the departure therefrom granted, only by written document executed by the party entitled to the benefits of such terms or provisions. No such waiver or consent shall be deemed to be or shall constitute a waiver or consent with respect to any other terms or provisions of this Agreement, whether or not similar. Each such waiver or consent shall be effective only in the specific instance and for the purpose for which it was given, and shall not constitute a continuing waiver or consent.

        (f)    <u>Assignment</u>. This Agreement may not be transferred or assigned without the prior written consent of the Company and any such transfer or assignment shall be made only in accordance with applicable laws and any such consent.

7

(g)     Benefit.  All statements, representations, warranties, covenants and agreements in this Agreement shall be binding on the parties hereto and shall inure to the benefit of the respective successors and permitted assigns of each party hereto.  Nothing in this Agreement shall be construed to create any rights or obligations except among the parties hereto, and no person or entity shall be regarded as a third-party beneficiary of this Agreement.

(h)     Governing Law.  This Agreement and the rights and obligations of the parties hereunder shall be construed in accordance with and governed by the law of the State of Delaware, without giving effect to the conflict of law principles thereof.

(i)     Jurisdiction and Service of Process.  Any legal action or proceeding with respect to this Agreement shall be brought in the courts of the State of New York or of the United States of America for the Southern District of New York.  By execution and delivery of this Agreement, each of the parties hereto accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.  Each of the parties hereto irrevocably consents to the service of process of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by certified mail, postage prepaid, to the party at its address set forth in Section 4(b) hereof.

(j)     Severability.  In the event that any court of competent jurisdiction shall determine that any provision, or any portion thereof, contained in this Agreement shall be unenforceable in any respect, then such provision shall be deemed limited to the extent that such court deems it enforceable, and as so limited shall remain in full force and effect.  In the event that such court shall deem any such provision, or portion thereof, wholly unenforceable, the remaining provisions of this Agreement shall nevertheless remain in full force and effect.

(k)     Interpretation.  The parties hereto acknowledge and agree that: (i) each party has had the opportunity to have counsel review the terms and provisions of this Agreement; (ii) the rule of construction to the effect that any ambiguities are resolved against the drafting party shall not be employed in the interpretation of this Agreement; and (iii) the terms and provisions of this Agreement shall be construed fairly as to the parties hereto and not in favor of or against any party, regardless of which party was generally responsible for the preparation of this Agreement.  Whenever used herein, the singular number shall include the plural, the plural shall include the singular, the use of any gender shall include all persons.

(l)     Headings and Captions.  The headings and captions of the various subdivisions of this Agreement are for convenience of reference only and shall in no way modify, or affect the meaning or construction of any of the terms or provisions hereof.

(m)     No Waiver of Rights, Powers and Remedies.  No failure or delay by a party hereto in exercising any right, power or remedy under this Agreement, and no course of dealing between the parties hereto, shall operate as a waiver of any such right, power or remedy of the party.  No single or partial exercise of any right, power or remedy under this Agreement by a party hereto, nor any abandonment or discontinuance of steps to enforce any such right, power or remedy, shall preclude such party from any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.  The election of any remedy by a party hereto shall not constitute a waiver of the right of such party to pursue other available remedies.  No notice to or demand on a party not expressly required under this Agreement shall entitle the party receiving such notice or demand to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the party giving such notice or demand to any other or further action in any circumstances without such notice or demand.

(n)     Survival of Representations and Warranties.  All representations and warranties made by

the parties hereto in this Agreement shall survive the execution and delivery hereof.

(o)     Expenses.  Each of the parties hereto shall pay its own fees and expenses (including the fees of any attorneys, accountants, appraisers or others engaged by such party) in connection with this Agreement and the transactions contemplated hereby whether or not the transactions contemplated hereby are consummated.

(p)     No Broker or Finder.  Each of the parties hereto represents and warrants to the other that no broker, finder or other financial consultant has acted on its behalf in connection with this Agreement or the transactions contemplated hereby in such a way as to create any liability on the part of the other.  Each of the parties hereto agrees to indemnify and save the other harmless from any claim or demand for commission or other compensation by any broker, finder, financial consultant or similar agent claiming to have been employed by or on behalf of such party and to bear the cost of legal expenses incurred in defending against any such claim.

(q)     Counterparts.  This Agreement may be executed in one or more counterparts, including electronic counterparts delivered by email as a .PDF document or by facsimile, and by different parties hereto on separate counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(r)     The Subscriber is purchasing the Shares as follows (please check as appropriate):

_____ individually          ___X___     in trust

_____ joint tenants          _____ as a partnership or LLC

_____ tenants in common          _____ other: _____

Name of Subscriber: Equity Trust Company as custodian for Karen Herman IRA
Address for Notice: 1 Equity Way, Westlake, OH 44145 Attn: Michael Cozart
Telephone:  _855-621-9857
Email Address: m.cozart@trustetc.com

Federal Income Tax I.D. (for entities): _____
Social Security Number (for individuals): ▓▓▓▓▓▓▓▓▓▓

5.     Under penalties of perjury, the Subscriber certifies that:

(a)     The number shown above is the Subscriber's correct Taxpayer Identification Number or Social Security Number, as the case may be;

(b)     The Subscriber is not subject to backup withholding either because the Subscriber has not been notified by the Internal Revenue Service ("IRS") that the Subscriber is subject to backup withholding as a result of a failure to report all interest or dividends, or the IRS has notified the Subscriber that the Subscriber is no longer subject to backup withholding;

(c)     The Subscriber is an Accredited Investor; and

(d)     THE SUBSCRIBER IS SUBSCRIBING FOR THE SHARES ONLY AFTER HAVING READ, CONSIDERED AND FULLY UNDERSTOOD THIS AGREEMENT, INCLUDING ALL OF

IN WITNESS WHEREOF, the Subscriber has executed this Agreement as a sealed instrument on this 3rd day of December, 2015.

Number of Shares that the Subscriber is entitled to purchase pursuant to this Agreement: 108,783 shares of Series Seed Preferred Stock for a total Purchase Price of $200,000.

For Individual Investors:                         For Coowners (if applicable):

_____        _____
Investor Signature                                Investor Signature

_____        _____
Print Name                                        Print Name

For Entities:

Equity Trust Company as Custodian for Karen Herman IRA
Name of Entity

_____
By (authorized signature)

Karen Herman
Print Name

Beneficiary
Title

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

The foregoing subscription for Shares of Series Seed Preferred Stock of Conduce Inc. is hereby accepted.

CONDUCE Inc.

By:
Name:    Kevin Parent
Its:     Chief Executive Officer
Date:    December 21, 2015

[Signature Page -- Subscription Agreement]

<u>**Exhibit A**</u>

**Investors' Rights Agreement**